**WO**

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

LAURA THOMPSON, a single woman;)
JUSTINE COX, a single woman; VICKIE)
LUTZ, a married woman; LACEY)
CHAINHALT, a single woman; and)
NICOLE MORGESON, a single woman,)
                             )
         Plaintiffs,       )
                             )
vs.                         )
                             )
STEVEN H. WIENER, M.D., and)
LAUREN WIENER, husband and wife;)
STEVEN H. WIENER, MD, P.C., an)
Arizona Professional Corporation;)
PAMELA S. HENDERSON, M.D., a)
single woman; PAMELA S.)
HENDERSON, MD, P.C., an Arizona)
Professional Corporation; NEW IMAGE)
PLASTIC SURGERY, L.L.C., an Arizona)
limited liability company; DOES I-X; and)
CORPORATIONS A-Z,      )
                             )
         Defendants.      )
_____)

No. CV-08-991-PHX-GMS

**ORDER**

        Pending before the Court is Defendants' Motion for Partial Summary Judgment. (Dkt. # 128.) The Motion seeks summary judgment with respect to all Defendants on Count I (Title VII of the Civil Rights Act of 1964) or, alternatively, in favor of Steven Wiener, M.D. ("Dr. Wiener"), Lauren Wiener, and Pamela Henderson, M.D. ("Dr. Henderson") on Count I and Count II (Arizona Civil Rights Act). The Motion also seeks summary judgment against all Plaintiffs on Count IV (constructive discharge) and against Nicole Morgeson only for

three other claims (Sexual Harassment, Intentional Infliction of Emotional Distress, Negligence Per Se). For the following reasons, the Court grants the Motion in part and denies it in part.

## BACKGROUND

Dr. Wiener is a plastic surgeon and the sole member of Steven H. Wiener M.D., P.C. ("Wiener P.C."), a professional corporation. Dr. Henderson is also a plastic surgeon and the sole member of Pamela S. Henderson, M.D., P.C. ("Henderson P.C."). Wiener P.C. and Henderson P.C. are the sole members of New Image Plastic Surgery, L.L.C. ("NIPS"). Wiener P.C. and Henderson P.C. are also allegedly the sole members of New Image Skin Spa, L.L.C. ("NISS"), which Ms. Wiener manages. Plaintiffs contend NISS and NIPS, which do business in nearby suites of the same building, share a joint trademark, events, marketing, and employment control. The employees who work at the NIPS office are employed by NIPS, not by either of the P.C.'s. NIPS employees also sometimes perform work for NISS, while still remaining on the NIPS payroll.

Plaintiffs Laura Thompson, Justine Cox, Vickie Lutz, Lacey Chainhalt, and Nicole Morgeson each worked at the NIPS office in some capacity. Ms. Lutz was the office manager, and Ms. Morgeson was her daughter. Ms. Morgeson was seventeen-years-old when she began employment.

Sometime in 2003 or 2004, Ms. Lutz posted a large poster concerning sexual harassment in the kitchen. The poster explained that the company does not tolerate sexual harassment. NIPS also distributed to all employees a handbook that addresses discrimination. This handbook, however, does not expressly address sexual harassment or define what discrimination includes. The handbook states the following:

> Any employees with questions or concerns about any type of discrimination in the workplace are encouraged to bring these issues to the attention of their immediate supervisor or the office administrator. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.

(Dkt. # 29, Ex. 11.)  Ms. Morgeson read and understood the poster and the handbook.

Conversations of a sexual nature occurred at the NIPS office, and although the parties dispute the extent of those conversations, the conversations are alleged to have included at least the following.  Dr. Wiener told sexual jokes and made sexual comments, including, in 2005, discussing Astro-Glide lubricant and telling others that he had a "bigger" penis than Ms. Thompson's boyfriend did.  Dr. Wiener also sent sexually-explicit emails to various employees and called employees into his office to watch hardcore pornography, including bestiality.[1]  At some point, Ms. Morgeson went into Dr. Wiener's office to tell him it was time for an oral examination in one of the patient rooms, to which Dr. Wiener responded, "Only if it was from [Ms. Morgeson]."  In 2007, Dr. Wiener told Ms. Morgeson that he would pay her and her friend twice as much to clean the office if they did so in their bathing suits.  All this occurred while Ms. Morgeson was still a minor.  Ms. Morgeson turned eighteen in March 2007, and the conversations continued.  Later that year, Dr. Wiener told Ms. Morgeson that he would pay to fix her truck if she would wear a bikini.  He also told her that she should get breast implants.  He told her several more times to get breast implants, even after she showed no interest in receiving them.  Dr. Wiener also held up large implants from the office, shook them around, and told coworkers, including Ms. Morgeson's mother, Ms. Lutz, that he was going to put the implants in Ms. Morgeson.[2]

Ms. Morgeson laughed at some of these jokes, but she explains that this was only to fit in.  Plaintiffs also concede that Ms. Morgeson never heard Dr. Wiener make any inappropriate comments to patients, never saw any pornography in the NIPS office, never saw Dr. Wiener engage in any sexual acts, and never saw him touch anyone inappropriately.

---

[1] Plaintiffs do not point to any evidence that Ms. Morgeson personally viewed pornographic materials at the office, although the other Plaintiffs claim to have been regularly subjected to it.

[2] Defendants note that NIPS allowed employees to receive free or low-cost breast augmentations and that other employees had done so.  But Defendants do not allege that Ms. Morgeson ever indicated an interest in receiving implants.

Ms. Morgeson initially did not complain to anyone. After she quit working for NIPS (which was one month after Ms. Lutz quit), she finally told Ms. Lutz that the comments bothered her.[3] Ms. Morgeson asserts she laughed at the jokes and did not tell anyone because she was embarrassed.

Ms. Chainhalt's employment was terminated in May 2007, and Ms. Cox was terminated in July 2007. Ms. Thompson reduced her hours to part-time in September 2006, and she was terminated in July 2007. Ms. Lutz resigned in July 2007, and Ms. Morgeson resigned in August 2007.

This lawsuit ensued. The Court previously dismissed several claims, leaving eight others. Defendants now move for summary judgment on several of the remaining claims.

## DISCUSSION

Defendants first contend they are not an "employer" under Title VII because they did not employ a sufficient number of employees. In response to Plaintiffs' assertion that various entities associated with Defendants constitute an "integrated enterprise" with more than fifteen aggregate employees, Defendants further dispute that such an integrated enterprise would have employed the requisite number of employees at any rate. Defendants also argue that none of the individual Defendants are liable under either Title VII or ACRA and that summary judgment is appropriate against Ms. Morgeson on her claims for sexual harassment, intentional infliction of emotional distress, and negligence per se. Finally, the parties dispute whether any of the Plaintiffs were constructively discharged.

## I. Summary Judgment Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Substantive

---

[3] Plaintiffs assert that it is unclear when Ms. Morgeson told Ms. Lutz about these events because Ms. Lutz testified that she thought she knew of them before she left NIPS, but that she was not sure. In any event, Ms. Lutz learned of at least some of the conduct from other sources while she was still working there.

law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, the moving party need not disprove matters on which the opponent has the burden of proof at trial. *Id.* at 323. Then, the burden is on the nonmoving party to establish a genuine issue of material fact. *Id.* at 322–23. The nonmoving party "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

In addition, the dispute must be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

## II.  Employer Liability Under Title VII

### A.  Integrated Enterprise

The threshold issue for Title VII liability is whether the Defendants are "employers" under Title VII, which requires, at a minimum, that Defendants employed fifteen or more employees for a certain period of time. *See* 42 U.S.C. § 2000e(b). "[T]he threshold number of employees . . . is an element of a plaintiff's claim for relief . . . ." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006). Title VII defines an employer as "a person engaged in an industry

affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."[4] 42 U.S.C. § 2000e(b). A "person" includes "one *or more* individuals, . . . partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations[.]" *Id.* § 2000e(a) (emphasis added).

Thus, a group of smaller entities can form a single employer under Title VII. "A plaintiff with an otherwise cognizable Title VII claim against an [entity] with less than [fifteen] employees may assert that the [entity] is so interconnected with another [entity] that the two form an integrated enterprise, and that collectively this enterprise meets the [fifteen]-employee minimum standard." *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 929 (9th Cir. 2003). Courts consider the entities' "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control." *N.L.R.B. v. Transcontinental Theaters, Inc.*, 568 F.2d 125, 129 (9th Cir. 1978); *see Herman v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 971*, 60 F.3d 1375, 1383 (9th Cir. 1995) (same). "The third factor, centralized control of labor relations, is the 'most critical.'" *Kang v. U. Lim. Am., Inc.*, 296 F.3d 810, 815 (9th Cir. 2002). But these factors are not dispositive, and the issue "ultimately depends on all the circumstances of the case." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 486 (3d Cir. 2001); *Royer v. CNF Transp. Inc.*, 2004 WL 1592561 at *4 (D. Or. July 15, 2004). A court might also consider, for example, common offices, interchange of employees, customer supervision, common bank accounts, and payroll. *See NLRB*, 568 F.2d 125, 129 (9th Cir. 1978); *Royer*, 2004 WL 1592561 at *4.

Here, the parties agree that NIPS,[5] not Henderson P.C. or Wiener P.C., employed Plaintiffs. But Plaintiffs contend that all Defendants, including NIPS and NISS, formed an

---

[4] The statute also includes exceptions not relevant to this case. 42 U.S.C. § 2000e(b).

[5] For convenience, "NIPS" may refer either to the LLC or to the general plastic surgery business and office, depending on the context.

integrated enterprise. According to employment charts offered by Plaintiff, NIPS and NISS in the aggregate employed at least fifteen employees for the requisite period. (*See* Dkt. # 155, Ex. 1.)

A reasonable jury could find that NIPS is integrated with Henderson P.C., Wiener P.C., and Drs. Henderson and Wiener. Drs. Henderson and Wiener are the sole members of their respective P.C.'s, and those P.C.'s are the sole members of NIPS. Moreover, Dr. Henderson explained that NIPS was created to have centralized labor—NIPS is an "overhead paying entity" that allows Wiener P.C. and Henderson P.C. to share expenses and to pay employees. (Dkt. # 155, Ex. 7.) The two P.C.'s contribute only enough money into NIPS each week to cover expenses, but NIPS never maintains any assets. Thus, NIPS, both P.C.'s, and the individual physicians involve interrelated operations and common management, ownership, and control. Drs. Henderson and Wiener manage and control the entire process, and NIPS exists solely to manage overhead costs.

After determining the connection between NIPS, the P.C.s, and the individual physicians, a reasonable jury could further conclude that NIPS is integrated with NISS. First, the two entities have interrelated operations. Although NIPS and NISS do not share the same suite, their offices are down the hall from each other in the same building, and the two entities share a common trademark. Moreover, Plaintiffs present evidence that some NISS employees performed services for NIPS.[6] Ms. Morgeson and Ms. Lutz provided translation services for Spanish-speaking NISS customers. Ms. Thompson supplied medical or cosmetic services to NISS, but she was paid exclusively by NIPS. After expressing displeasure with working at NIPS, Ms. Cox was instead allowed to work at NISS for a few days. However, she remained on the NIPS payroll and received payment from NIPS for her work at NISS.

NIPS and NISS also jointly organize events and advertisements. For example, NIPS and NISS held an event for NISS's grand opening, during which NIPS employees were

---

[6] Defendants dispute this fact, but the Court takes all factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 248.

identified as NISS "staff," and the two businesses held joint business parties. The two entities also sent out marketing pieces advertising both businesses. The two entities advertised in each others' offices, and NIPS gave its patients coupons to attend NISS. While these events were limited, a jury could find these joint activities evidence an integrated enterprise.

The two entities also have common management, ownership, and financial control. Drs. Henderson and Wiener, as the sole members of the P.C.s, are de facto owners and managers of both NIPS and NISS. With this control, the individual doctors can control all business and personnel aspects of both NIPS and NISS. For example, NIPS exists solely to share payroll and other expenses, and individuals employed by NIPS may work at either the NIPS or NISS office. Although Lauren Wiener manages NISS, evidence does not clearly establish her degree of control;[7] having separate office managers, while a factor, does not negate the connection between the entities.

Defendants assert that NIPS and NISS do not have centralized control of labor relations. Although Plaintiffs do not present evidence that NIPS, as an entity, controls NISS's labor relations, analogous cases have found that joint ownership and substantial control can suffice. *See, e.g.*, *Westphal v. Catch Ball Prods. Corp.*, 953 F. Supp. 475, 479 (S.D.N.Y. 1997) (submitting issue to jury where the same person ran multiple small companies with the same function, where the companies coordinated commissions and deliveries, and where the companies jointly discussed business matters); *E.E.O.C. v. Arlington Transit Mix Inc.*, 734 F. Supp. 804, 807 (E.D. Mich. 1990), *reversed and remanded on other grounds*, 957 F.2d 219 (6th Cir. 1991) (finding two companies were interrelated

---

[7] Defendants point to Plaintiffs' depositions, which describe how Ms. Cox returned to work at NIPS after Ms. Wiener indicated she did not want Ms. Cox to continue working at NISS. Contrary to Defendants' assertion, this alone does not mean that "Mrs. Wiener could overrule employment decisions made by Dr. Wiener and Vickie Lutz." Dr. Henderson even testified that Ms. Wiener is "supervisor, but . . . not the boss." Especially in light of Drs. Wiener and Lutz's overall control of both businesses, a reasonable jury could find that Ms. Wiener does not have complete employment power.

where the same person owned both companies, and where the companies shared letterhead, corporate officers, employees, equipment, and accounting); *E.E.O.C. v. McLemore Food Stores, Inc.*, 25 FEP 1356 at *7 (W.D. Tenn. 1978) (finding single enterprise where same group of family owners hired employees for any of their multiple corporations and would then loan and transfer employees between the corporations). Just like the companies in the above-cited cases, the relevant entities here are commonly owned and operated. Henderson P.C. and Wiener P.C. own both NIPS and NISS. As such, Drs. Henderson and Wiener have the ability to control each entity. The other evidence of interrelation of employees, infrastructure, advertising, and events between the entities further creates an issue of fact as to what level of centralized-labor-control existed.

### B. Number of Employees

Even assuming Defendants form an integrated enterprise with NISS, Defendants do not come within Title VII's scope unless the integrated enterprise employed fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year. 42 U.S.C. § 2000e(b). Plaintiffs offer a chart showing that NIPS and NISS collectively employed at least fifteen employees from April 2006 through July 2007. (Dkt. # 155, Ex. 1.) Ms. Thompson and Ms. Lutz also declared that the charts accurately listed the employment dates for the listed employees and that there were even other employees who worked for either NISS or NIPS, but for whom Ms. Thompson and Ms. Lutz were "unsure" of their exact dates of employment. (Dkt. # 155, Exs. 1–2.)

Defendants first contend these declarations are inadmissible because Ms. Thompson and Ms. Lutz do not have personal knowledge of who worked at NISS and NIPS from 2006 to 2007. "Affidavit[s] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). These requirements, however, "may be inferred from the affidavits themselves." *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). Ms. Lutz's declaration states that she was the office administrator for NIPS from 2001 until June 2007 and that she supervised employees. (Dkt. # 155, Ex. 3.) Thus, she was

in a position where she both observed and monitored employees. Likewise, although Ms. Thompson's declaration does not state her dates of employment (the Complaint alleges employment began in 1998), it is clear from the declaration that she was a NIPS employee; as such, she also could observe which employees worked for the two small companies. Moreover, the fact that the chart states that some employees' last names were unknown goes to the weight of the evidence only; it does not negate personal knowledge. Therefore, the declarations constitute valid evidence of the number of employees.

Defendants also contend that Plaintiffs' chart is incorrect in the following ways: (1) Lauren Wiener did not work at NISS during all applicable times, (2) NISS never employed anyone named Leeanne LaMonte, but that a Leanne Wilmot worked at NISS beginning on March 5, 2007, (3) Ms. Morgeson did not begin working at NIPS until the summer of 2006, (4) Lyn Borman did not work at NISS in 2007, (5) Marie Desarthe did not work at NISS on the dates alleged, and (6) Lisa Maness was only employed from January 27 to February 9, 2007.

Defendants present an affidavit by Ms. Wiener and payroll records, but this evidence does not negate a genuine issue of fact.[8] First, it is unclear why Ms. Morgeson's start date in the summer of 2006, or Marie Desarthe's or Lisa Maness's end dates are relevant. Plaintiffs' employment chart begins in April 2006 and covers each week from January 1, 2007 through July 14, 2007. Even if Ms. Morgeson was not an employee until the summer of 2006, Plaintiffs can still show another twenty or more weeks with at least fifteen

---

[8] Plaintiffs assert Defendants are precluded from using the payroll records under Federal Rule of Civil Procedure 37(c), which states, "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial . . . ." Plaintiffs requested production of "all of [Defendants'] payroll accounts and records from the period of January 2001 to present reflecting all full-time and part-time employees hired, employed or who were suffered to work for Defendants." (Dkt. # 155, Ex. 4 at 8.) Defendants objected based on relevance, undue burden, third-party privacy rights, confidentiality, and vagueness. (Dkt. # 155, Ex. 6 at 11.) The Court reserves judgment on this discovery issue because Plaintiffs have created a genuine issue of material fact regardless.

employees in either 2006 or 2007. *See* 42 U.S.C. § 2000e(b). Likewise, the case is the same even if Ms. Maness left NISS on February 9, 2007 because fifteen employees could have worked for the enterprise during 2006. And in 2007, the charts asserts that both Ms. Maness and Ms. Desarthe worked during many weeks where *more* than fifteen people allegedly were employed; their absences would not necessarily bring the total below fifteen employees.

Additionally, there is an issue of fact as to the employment periods for the other employees Defendants contend did not work at New Image during the relevant times. Plaintiffs offer signed and notarized affidavits from Ms. Thompson, Ms. Lutz, Ms. Cox, and Sheron Turas, who worked at NISS from its inception until June 2007, which state that Ms. Wiener worked at NISS during their entire times of their employment. Ms. Turas also asserted that Leanne Wilmot (apparently referred to as Leeanne LaMonte on Plaintiffs' chart) worked at NISS in 2006[9] and from January 1 through March 3, 2007. Ms. Turas also stated that when Lyn Borman left NISS, another receptionist (whose name is unclear) replaced her to maintain the fifteen-employee threshold.

Defendants next argue that Margarita Sargent and Judith Jones were independent contractors, rather than employees.[10] According to Plaintiffs' employment chart, the New Image integrated enterprise would not reach the fifteen-employee threshold if either is an independent contractor. Title VII protects employees, 42 U.S.C. § 2000e, but it does not protect independent contractors. *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999). Whether an employee is an independent contractor is a "fact-specific inquiry which depends on the economic realities of the situation." *Id.* (internal quotations omitted). "The primary factor is the extent of the employer's right to control the means and manner of the

---

[9] At oral argument, Defendants' counsel asserted that Ms. Turas's statement that Ms. Wilmot worked "in 2006" was insufficient evidence because it does not specify which weeks she worked. It is not strong evidence. However, it is sufficient for a jury to conclude that the enterprise reached the fifteen-employee threshold in 2006.

[10] Defendants do not address Plaintiff's assertion that Ms. Thompson was not an independent contractor.

worker's performance[,]" but other factors may include the type of occupation, whether the position is typically supervised, whether the employer provided equipment and workspace, the length of employment, method of payment, tax arrangements, the manner in which the work relationship is terminated, and the parties' intent. *Id.*

Here, there is an issue of fact as to whether Ms. Sargent and Ms. Jones were independent contractors or employees. Ms. Sargent is a surgical technician, and Ms. Jones is a nurse anesthetist, both of whom work with either Dr. Henderson or Dr. Wiener on surgeries. On the one hand, both refer to themselves as independent contractors. They are not paid salary by NIPS, but rather are paid separately by each doctor for each procedure with which they assist. And at oral argument, Plaintiffs' counsel acknowledged that Ms. Sargent and Ms. Jones also reported their income on 1099 independent contractor tax forms.

Payment procedures, however, are not dispositive, and there is evidence suggesting that Ms. Sargent and Ms. Jones were employees. Both have worked extensively with Dr. Wiener and Dr. Henderson. For example, Ms. Sargent began as an employee of NIPS in 2000, before her pay structure changed. Plaintiffs explain that the only reasons Ms. Sargent changed her payment structure were because she wanted to work exclusively with Dr. Wiener (since NIPS is a vehicle for both doctors to share expenses, NIPS could not pay Ms. Sargent for working exclusively with Dr. Wiener) and because the hospitals required a special contract to assist in surgeries. Meanwhile, Ms. Jones has provided services exclusively to Dr. Wiener and Dr. Henderson for thirteen years. Neither Ms. Sargent nor Ms. Jones appear to provide free-floating services-for-hire. Both Ms. Sargent and Ms. Jones use equipment and facilities that NIPS owns or operates. Although Ms. Sargent uses her own scrubs and liability insurance,[11] Defendants provide the vast majority of her infrastructure, including materials, equipment, and buildings. Moreover, neither Ms. Sargent nor Ms. Jones

---

[11] Defendants do not assert whether Ms. Jones provides her own equipment or insurance.

have control over their own hours, but rather they work according to the doctors' schedules. Contrary to Defendants' suggestion, the fact that Ms. Sargent and Ms. Jones have nontraditional schedules does not mean they could not be employees. Ms. Sargent and Ms. Jones were under sufficient control for a reasonable factfinder to determine they are employees. Despite Defendants' evidence regarding these employees, the Court does not weigh evidence or credibility on summary judgment, and an issue of fact exists.

Defendants cite several out-of-circuit cases that determined plaintiffs were independent contractors, but these cases are distinguishable. In *Vakharia v. Swedish Covenant Hosp*, an anesthesiologist was an independent contractor where she was self-employed for tax purposes, paid her own malpractice insurance, and received no employee benefits. 190 F.3d 799, 805 (7th Cir. 1999). However, the *Vakharia* court noted that the plaintiff had no specific evidence that the hospital exercised close control over her to establish an employment relationship, whereas Ms. Sargent and Ms. Jones have submitted evidence that they had little control over their working lives. The same distinction makes *Moebus v. OB-GYN Assocs., Inc.* inapplicable because the plaintiffs in that case, unlike Ms. Sargent and Ms. Jones, had broad discretion over their hours and work-product. 937 F. Supp. 867, 869 (E. D. Mo. 1996).

## III. Individual Liability Under Title VII and ACRA

Title VII and ACRA do not impose liability on individuals who are not themselves "employers." *See* 42 U.S.C. § 2000e(b) (establishing Title VII liability against "employers"); *Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587–88 (9th Cir. 1993) ("[I]ndividual defendants cannot be held liable under Title VII . . . There is no reason to stretch the liability of individual employees beyond the respondeat superior principle intended by Congress."); Ariz. Rev. Stat. § 41-1461(4) (defining "employer" under ACRA); *Ransom v. State of Ariz. Bd. of Regents*, 983 F. Supp. 895, 904 (D. Ariz. 1997) (finding ACRA applies only to employers with fifteen employees or more, not to individual employees). Plaintiffs do not respond to this argument except to acknowledge *Miller* and to "preserve" the issue for appeal. Accordingly, the Court grants summary judgment in favor of Dr. Henderson, Dr.

Wiener, and Ms. Wiener in their individual capacities on the Title VII and ACRA claims against them.

## IV. Exhaustion of Administrative Remedies

After Plaintiffs provided evidence in their Response that all Plaintiffs received right-to-sue letters, Defendants withdrew their argument that Plaintiffs failed to exhaust their administrative remedies. Thus, Defendants' Motion is denied on this issue.

## V. Sexual Harassment (Count I) as to Ms. Morgeson

### A. Hostile Work Environment

Title VII prohibits discrimination based on sex, and this includes sexual harassment. *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination based on sex); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986) (interpreting discrimination to include sexual harassment). A plaintiff may establish a sex discrimination claim under Title VII by proving that sexual harassment created a hostile work environment. *See Meritor*, 477 U.S. at 66-67. To establish a prima facie case of a hostile work environment under Title VII, a plaintiff must show (1) she was "subjected to verbal or physical conduct of a . . . sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003). The work environment "must be both objectively and subjectively offensive, one that a reasonable [woman] would find hostile or abusive, and one that the [plaintiff] in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993))

As for the subjective element, Ms. Morgeson must show that the alleged harassment was "unwelcome." *See Meritor*, 477 U.S. at 68; *Nichols v. Azteca Restaurant Enter., Inc.*, 256 F.3d 864, 873 (9th Cir. 2001). Defendants do not argue that Ms. Morgeson welcomed Dr. Wiener's conduct, and Plaintiffs presented evidence that the conduct bothered Ms. Morgeson.

The question presented here is whether the conduct was objectively offensive. To determine whether conduct was sufficiently severe or pervasive to violate Title VII, courts look at all the circumstances, including, but not limited to "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-88 (quoting *Harris*, 510 U.S. at 23). "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *Nichols*, 256 F.3d at 872 (quoting *Ellison*, 924 F.2d at 878). However, "while frequency and severity of conduct are important factors to consider when assessing whether a hostile environment was created, ultimately it is the effect or consequences of conduct on the working environment that must be evaluated." *Canada v. Boyd Group, Inc.*, 809 F. Supp. 771, 776 (D. Nev. 1992) (citing *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991)). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. But the objective severity is judged "from the perspective of a reasonable person in the *plaintiff's* position," *Nichols*, 256 F.3d at 872 (emphasis added), and "[c]ommon sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

Although physical contact and conduct that occurs constantly are more likely to constitute hostile work environments, these factors are not prerequisites, especially given that the conduct's effect and consequences are the key factors. *See Ellison*, 924 F.2d at 880 (9th Cir. 1991) (finding summary judgment inappropriate where female worker received "bizarre," but infrequent, love letters from male co-worker); *Newtown v. Shell Oil Co.*, 52 F. Supp.2d 366, 372 (D. Conn. 1999) (holding a jury could determine whether a hostile work environment existed, where plaintiff was subjected to *two* incidents of offensive name-calling, one of which was outside her presence, and where employee frequently called the

plaintiff "woman" in a derogatory manner); *see generally Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, (1998) (impliedly finding a hostile work environment when plaintiff was subjected to three incidents of sex-related job threats). In addition to comments directed at a plaintiff, courts may also consider comments made generally in the work environment. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (finding a hostile work environment where some derogatory comments were made about women generally, rather than about the plaintiff herself, and noting that "[o]ffensive comments do not all need to be made directly to an employee for a work environment to be considered hostile.").

Here, Dr. Wiener subjected Ms. Morgeson to unwelcome verbal conduct of a sexual nature, and this conduct was severe and pervasive enough that a reasonable jury could conclude it altered her working environment. Like the plaintiffs in *Ellison*, 924 F.2d at 880, *Newtown*, 52 F. Supp.2d at 372, and *Ellerth*, 524 U.S. 742, Ms. Morgeson was subjected to several incidents of verbally-offensive conduct directed at her. On at least two occasions, Dr. Wiener told her that he would pay her if she did her work in a bikini, and at least one of these incidents was in front of other people. Dr. Wiener also allegedly propositioned Ms. Morgeson, stating that he would only go to an oral examination "if it was from [Ms. Morgeson]." Ms. Morgeson testified that she understood this as a sexual proposition. Furthermore, on multiple occasions, Dr. Wiener told Ms. Morgeson that she should get breast implants, even after Ms. Morgeson had not given any indication she wanted to do so. Like the unwelcome love letters in *Ellison* and the offensive name-calling in *Newtown*, the verbal conduct against Ms. Morgeson was more than simple teasing. It is the type that a reasonable jury could determine would make a reasonable woman in her situation feel as though her working conditions were altered. In addition to conduct directed at her, Ms. Morgeson also repeatedly heard Dr. Wiener make inappropriate sexual comments to others. Like the offensive comments made about women in *Davis*, 520 F.3d at 1096, Ms. Morgeson's exposure to a sexually-charged environment could alter her working conditions. In addition, much of this conduct occurred while Ms. Morgeson was still a minor, which magnifies the conduct she experienced.

Defendants cite several cases that did not find hostile work environments, but they are distinguishable. For example, in *Sprague v. Thorn Americas, Inc.*, the Tenth Circuit held that no hostile work environment existed where several inappropriate comments were made. The comments in *Sprague*, however, were not as overtly sexual nor as closely-related to the employment relationship. 129 F.3d 1355, 1366 (10th Cir. 1997). Several of the comments occurred outside the workplace. *Id.* Other comments made at the workplace related to undoing a top button, PMS, "kinky" neck chains, and stating that "you can't call [employees] girls[,] [y]ou have to call them ladies." None of these comments is as direct as telling Ms. Morgeson to get breast implants or to wear a bikini multiple times, requesting an "oral" examination, or the pervasive showing of pornography and sexual jokes at the office. The defendants in *Sprague* also did not tie any of their comments to the employment relationship; in contrast, Dr. Wiener told Ms. Morgeson that she could make more money if she wore a bikini. *Rosario v. Dep't of Army* is another out-of-circuit opinion that this Court declines to follow. 573 F. Supp.2d 524, 530 (D. P.R. 2008). *Rosario* granted summary judgment in favor of employer where an employee told sexually-oriented jokes, told people in the office that the plaintiff dressed like a whore and a prostitute, called the plaintiff fat, and threw away her food and personal items. *Id.* Despite *Rosario,* a jury could conclude the repeated conduct in this case constituted a hostile work environment, especially given that Ms. Morgeson was seventeen-years-old during part of the employment relationship. Likewise, in *Brooks v. City of San Mateo*, a coworker placed his hands on the plaintiff's stomach, commented on its sexiness, and touched her bare breast. 229 F.3d 917, 921–22 (9th Cir. 2000). That case, however, dismissed the case against the *city* because the city took quick remedial measures against the employee and because the incident occurred only one time. *Id.* Here, there was no similar remedial action; rather, Plaintiffs allege Dr. Wiener continued the harassment.

## B. *Faragher/Ellerth* Defense

Even if Ms. Morgeson could otherwise survive summary judgment, Defendants contend they are entitled to summary judgment on an affirmative defense. Although the Defendants may raise the defense, summary judgment is inappropriate. "An employer is

subject to vicarious liability . . . for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." However, if "no tangible employment action is taken, a defending employer may raise an affirmative defense" by satisfying two elements: (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Faragher*, 524 U.S. at 807.

The mere existence of a harassment policy does not necessarily establish that an employer acted reasonably, *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 953 (7th Cir. 2005). Defendants cite *Kohler v. Inter-Tel Techs.*, which upheld summary judgment in favor of the defendant-employer because the employer exercised reasonable care to prevent sexual harassment and the employee unreasonably failed to utilize  the employer's anti-discrimination policies. 244 F.3d 1167, 1180–81 (9th Cir. 2001). The court in *Kohler* considered that the employer distributed a sexual harassment policy, which provided a definition of sexual harassment, identified whom employees should contact, ensured that supervisors could be bypassed in complaint procedures, described disciplinary measures, and provided a statement that the company did not tolerate retaliation. *Id.* at 1180. The court also noted that the defendant-employer immediately took corrective action against the harasser, which was critical because the "first prong of the affirmative defense also requires [the employer] to demonstrate that it exercised reasonable care to promptly correct sexually harassing behavior." *Id.* at 1181.

By contrast, in this case, Defendants did not have a detailed policy. Rather, they had one paragraph in a handbook and a poster. The poster merely stated that the office did not tolerate sexual harassment, but it did not explain what sexual harassment was, what remedy employees should seek, or any other instructions. Meanwhile, the handbook addressed only "discrimination," but it did not address harassment or define what discrimination would include. Although Ms. Morgeson testified that she understood that she could report the misconduct to someone, an issue of fact exists as to whether the handbook and poster alone

constituted "reasonable care" by NIPS. Moreover, Defendants offer no evidence that they took any corrective action as occurred in *Kohler*. Dr. Wiener never stopped any of his conduct, nor did anyone else direct him to stop. Although it is difficult to take corrective action when an employee has not reported the conduct, the parties do not dispute that Dr. Wiener made at least some of his comments in the presence of multiple people in the office.[12]

Even if the handbook and poster constituted reasonable care to prevent sexual harassment, the defense does not apply where the sexual harasser is a controlling figure that cannot reasonably be separated from the employer-entity for purposes of liability. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 516 (9th Cir. 2000) ("[A]n individual sufficiently senior in the corporation must be treated as the corporation's proxy for purposes of liability."); *E.E.O.C. v. Sunfire Glass, Inc.*, 2009 WL 976495 at *10 (D. Ariz. Apr. 10, 2009) (finding corporation liable for owner-president's sexual harassment because he was the corporation's alter-ego) (citing *Passantino*, 212 F.3d at 516, *Faragher*, 524 U.S. at 789). Here, Dr. Wiener committed the alleged harassment, and as discussed above, a jury could find that he is one of the controlling individuals in the integrated enterprise. It is not necessary that the Court determine whether the two P.C.s and two L.L.C.'s are Dr. Wiener's alter-ego. It is sufficiently analogous that the companies are part of one integrated enterprise and that Dr. Wiener was a key player in continuing this practice. The Court cannot conclude as a matter of law that Dr. Wiener's employer-entities took reasonable care to prevent harassment where Dr. Wiener committed and continued the alleged harassment. Because the Court concludes summary judgment is inappropriate because of the first element of the defense, the Court need not address the second element.

---

[12] These included, for example, telling Ms. Morgeson and her friend to wear bikinis and flaunting large breast implants around the office in front of Ms. Lutz while saying he was going to put the implants in Ms. Morgeson.

**VI.    Intentional Infliction of Emotional Distress (Count III) as to Ms. Morgeson**

Intentional infliction of emotional distress exists if the defendant commits "extreme and outrageous" conduct, the defendant "either intend[ed] to cause emotional distress or recklessly disregard[ed] the near certainty that such distress will result from [his or her] conduct[,]" and "severe emotional distress . . . occur[s][.]" *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 257, 619 P.2d 1032, 1035 (1980).  Liability exists only when the conduct goes "beyond all possible bounds of decency" and is "regarded as atrocious[] and utterly intolerable in a civilized community." *Id.*, 619 P.2d at 1035.  Moreover, not all Title VII harassment constitutes intentional infliction of emotional distress because Title VII discrimination "occurs at a much lower threshold of inappropriate conduct than the threshold required for the tort of intentional infliction of emotional distress." *Stingley v. Arizona*, 796 F. Supp. 424, 431 (D. Ariz. 1992.)  "Only when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous does the issue go to the jury." *Mintz v. Bell Atl. Sys. Leasing Intern., Inc.*, 183 Ariz. 550, 554, 905 P.2d 559, 563 (Ct. App. 1995).

Defendant's Motion argues only that Dr. Wiener's comments to Ms. Morgeson were not extreme and outrageous.[13]  Sexual harassment by a supervisor may be extreme and outrageous because "an employer owes his or her employees a greater degree of respect because of the employment relationship." *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1466 (9th Cir. 1994) (applying Nevada law, but citing Restatement (Second) of Torts § 46, cmt. e, which *Mintz* cites with approval, 183 Ariz. at 554, 905 P.2d at 563).  Defendants assert it is rare to find extreme and outrageous conduct in the employment context, but the cases so holding dealt not with sexual harassment, but rather with discriminatory hiring. *See, e.g.*, *Mintz*, 183 Ariz. at 554, 905 P.2d at 563 (finding conduct was not extreme and

---

[13] Defendants make a new argument in their Reply, contending Plaintiffs could not demonstrate the other element of the tort, severe emotional distress.  The Court does not address this argument because Defendants did not raise it in their Motion. *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1021 n. 4 (9th Cir. 2005) (finding issued not waived in opening materials are waived).

outrageous when employer made a gender-based position reassignment and informed the employee of the change while she was in the hospital).

Here, a reasonable jury could conclude Dr. Wiener's conduct was extreme and outrageous. As discussed above, Dr. Wiener made unwanted sexual advances toward Ms. Morgeson on multiple occasions. These included telling her multiple times to wear a bikini to work, telling her multiple times to get breast implants, and suggesting she should give him an "oral examination". Some of these comments occurred in front of others, where they would likely be more embarrassing and thus more extreme and outrageous. Even assuming *arguendo* that each of these incidents is not extreme and outrageous alone, a reasonable jury could determine that the events in the aggregate were extreme and outrageous.

## VII. Negligence Per Se (Count VI) as to Ms. Morgeson

Plaintiffs' Complaint alleges Dr. Wiener violated Arizona's public indecency statute. Ariz. Rev. Stat. § 13-403. Section 13-1403(A) provides:

> A person commits public sexual indecency by intentionally or knowingly engaging in any of the following acts, if another person is present, and the defendant is reckless about whether such other person, as a reasonable person, would be offended or alarmed by the act:
>
> 1. An act of sexual contact.
> 2. An act of oral sexual contact.
> 3. An act of sexual intercourse.
> 4. An act of bestiality.

Plaintiffs present no evidence of any sexual contact, oral sexual contact, sexual intercourse, or bestiality occurring with Ms. Morgeson. The Court thus finds summary judgment appropriate on this issue.

## VIII. Constructive Discharge (Count IV) as to All Plaintiffs

Constructive discharge exists if "working conditions are so intolerable that a reasonable person would have felt compelled to resign." *Id.* at 147; *see also Steiner*, 25 F.3d 1459, 1465 (9th Cir. 1994) (requiring showing that "a reasonable person in [her] position would have felt that [she] was forced to quit because of intolerable and discriminatory working conditions") (internal quotations omitted). It involves "something more" than

normal harassment, and constructive discharge does not lie "[u]nless conditions are beyond 'ordinary' discrimination[.]" *Suders*, 542 U.S. at 142 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997). "'Constructive discharge is not a cause of action in its own right[,]'" but instead can be maintained only if "there is another legally cognizable injury present." 2008 WL 5068945 at *8 (D. Ariz. Nov., 25, 2008) (quoting *Anderson v. Arizona*, 2007 WL 1461623 at *16 (D. Ariz. May 16, 2007)). The parties do not brief the issue in-depth, but it appears that the other legally-cognizable injury must be an employment law cause of action.

Because the Court grants summary judgment on both Title VII and ACRA against the individual Defendants, the Court likewise grants summary judgment on the Constructive Discharge claim against the individual Defendants. On the other hand, as against the employer-entities, at least one underlying claim, Title VII, can serve as the basis for Plaintiffs' constructive discharge claims. Defendants, however, contend Plaintiffs' constructive discharge claims fail for other reasons.

### A. Ms. Cox, Ms. Chainhalt, and Ms. Thompson

An employee must resign to prove a constructive discharge claim. *See Suders*, 542 U.S. at 147 (requiring that a person "felt compelled to resign"); *Ross v. Ariz. State Personnel Bd.*, 185 Ariz. 430, 432 n. 1, 916 P.2d 1146, 1148 n. 1 (Ct. App. 1995) ("The doctrine of constructive dismissal is inapplicable [where the plaintiff] does not claim that her employer forced her to resign . . . ."). Plaintiffs agree that Ms. Cox and Ms. Chainhalt did not voluntarily resign, but instead were terminated. Thus, they cannot argue they were constructively discharged.

Plaintiffs also admit in their Response that Ms. Thompson did not resign. Plaintiffs assert that "Ms. Thompson . . . decreased her hours to part-time[,]" in February 2007, but that

"the ultimate decision to terminate the employment relationship was that of Dr. Wiener" in June 2007. (Dkt. # 154 at 10.) Thus, Ms. Thompson's constructive discharge claim fails.[14]

## B. Ms. Lutz

In contrast, Ms. Lutz's constructive discharge claim survives as against the entity Defendants. Ms. Lutz alleges two main reasons for her constructive discharge: first, the comments to her daughter upset her, and second, the sexual jokes and pornography were inappropriate. Ms. Lutz testified that the sexually-charged environment was "getting out of control" and "inappropriate." A reasonable jury could find that a reasonable mother in Ms Lutz's position would feel compelled to quit after hearing that her seventeen-year-old daughter was being subjected to a sexual environment. Although Ms. Lutz also testified that she wanted to quit for other reasons besides the sexual work environment and wanted to wait to quit until she had another job, this is evidence only of her subjective feelings. Constructive discharge, however, is an "objective" test: whether a reasonable person in the employee's position would have felt compelled to resign. *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). Defendants also point out that Ms. Lutz testified that she was not sure when Ms. Morgeson told her about Dr. Wiener's comments; Defendants reason that if Ms. Lutz was unaware of the comments, they could not form the basis for her alleged constructive discharge. However, Ms. Lutz also testified that she "believed" she knew about some of the comments before she quit, and she knew about the breast implant comments from an independent source. Accordingly, this is a factual dispute about Ms. Lutz's knowledge, and summary judgment is inappropriate.

_____

[14] Defendants' Motion originally argued that Ms. Thompson resigned in February 2007, became an independent contractor through June 2007, and eventually was fired. Defendants assert that the fact that Ms. Thompson worked for four more months demonstrates that she was not compelled to resign. In response to this argument, Plaintiffs state that Ms. Thompson never became an independent contractor, but instead reduced her hours before she was eventually fired. Plaintiffs thus acknowledge that Ms. Thompson did not resign. At oral argument, Plaintiffs' counsel again admitted that Ms. Thompson ultimately left NIPS after her termination, and Plaintiffs' counsel did not offer any authority that simply reducing one's hours establishes a constructive discharge claim.

### C. Ms. Morgeson

As discussed in Section V, Ms. Morgeson has provided facts sufficient for a reasonable jury to find a hostile work environment. Thus, the only remaining question is whether a jury could find she suffered "something more" than ordinary harassment. A jury could so find. Plaintiffs contend she experienced multiple comments telling her she could get paid more for wearing a bikini, multiple comments telling her to get breast implants, a request for an "oral" examination, and other sexually-inappropriate material while she was a minor. Although Ms. Morgeson testified that other factors also influenced her decision to quit, including the new office manager and the driving distance, she indicated her main reason for leaving (in contrast to Ms. Lutz) was the direct sexual harassment. (Dkt. # 129, Ex. 2.) Ms. Morgeson also said she would have quit even if there had not been a new office manager. *Id.* It is also not dispositive that Ms. Morgeson wrote a professional resignation letter and gave two weeks' notice. A jury could find that she did so to remain professional and to increase her chances at future employment elsewhere. Given these facts, a reasonable young woman in her situation could feel compelled to resign.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The Court grants the Motion in the following respects:

1. Grants summary judgment on counts I (Sexual Harassment), II (ACRA), and IV (Constructive Discharge) against the individual Defendants.

2. Grants summary judgment on the constructive discharge claims by Ms. Thompson, Ms. Cox, and Ms. Chainhalt against all Defendants.

3. Grants summary judgment on Count VI (Negligence Per Se) against all Defendants.

The Court denies the Motion in all other respects.

/ / /

/ / /

1　　　　**IT IS FURTHER ORDERED** directing the Clerk of the Court **TERMINATE**

2　Defendant Pamela S. Henderson, M.D., individually, from this action.

3　　　　DATED this 17th day of December, 2009.

4

5　　　　　　　　　　　　　　　　　　　　　　　　　　G. Murray Snow
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28